IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Syretta Marie Taylor,              )
                                   )
                Plaintiff,         )        Civil Action No.: 9:12-cv-1361-SB
                                   )
v.                                 )
                                   )                **ORDER**
Commissioner of the Social Security )
Administration,                    )
                                   )
                Defendant.         )
_____)

This is an action brought pursuant to section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("the Commissioner") final decision, which denied Plaintiff Syretta Taylor's ("the Plaintiff") claim for supplemental security income ("SSI"). The record includes the report and recommendation ("R&R") of a United States Magistrate Judge, which was made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a) (D.S.C.). In the R&R, the Magistrate Judge recommends that the Court affirm the Commissioner's final decision denying benefits. The Plaintiff filed objections to the R&R, and the Defendant filed a response to those objections. See 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to an R&R within fourteen days after being served with a copy).

## BACKGROUND

### I.    Procedural History

The Plaintiff applied for SSI on May 12, 2009, alleging disability since February 1, 2007, due to vertigo, panic attacks, headaches, back pain, depression, post traumatic stress disorder ("PTSD"), dizziness, anxiety, and blurry vision. The Commissioner denied



her claims initially and upon reconsideration.  The Plaintiff filed a request for a hearing, and on January 6, 2011, Administrative Law Judge ("ALJ") Thomas G. Henderson held a hearing at which the Plaintiff, her mother, and a vocational expert ("VE") testified.  (Tr. at 29, 41, and 49.)  On January 14, 2011, the ALJ issued a decision denying benefits.  (Tr. at 15-24.)  The Appeals Council thereafter denied the Plaintiff's request for review, making the ALJ's determination the final decision of the Commissioner.  The Plaintiff filed this action on May 22, 2012, seeking judicial review of the Commissioner's final decision.

## II.    Evidence Presented

Neither party objected to the R&R's summary of the evidence presented.  Therefore, the Court adopts this portion of the R&R and restates the evidence as follows.

### A.    Medical Evidence

The claimant was born on October 17, 1975, and was thirty-three when she filed her application for SSI benefits.  The record indicates that the Plaintiff has at least a high school education and no past relevant work experience.  (Tr. at 23.)

On February 14, 2007, the Plaintiff arrived by ambulance at Trident Medical Center to treat an antidepressant overdose.  It is not clear whether this was an accident or a deliberate suicide attempt; however, the Plaintiff was diagnosed with depressive disorder, anxiety state not otherwise specified, leukocytosis unspecified, and cardiac dysrhythmias.  The Plaintiff was discharged on February 17, 2007, and was instructed to pursue "routine home/self care."  (Tr. at 225-26.)

On December 15, 2007, the Plaintiff returned to Trident Medical Center by ambulance, complaining of chest discomfort associated with rapid heart beat, dizziness,



2

and anxiety. The Plaintiff had been taking the antidepressant Elavil each night before bed. Physical and systems examinations were essentially normal, and Dr. Christopher McCrae characterized the event as an anxiety reaction, instructed the Plaintiff to refrain from using stimulants, and wrote a prescription for Xanax with no refills. The Plaintiff was advised to follow up with a primary care physician and was discharged. (Tr. at 239-41.)

On February 13, 2008, the Plaintiff again arrived at Trident Medical Center by ambulance, complaining of acute chest pain, continuing depression, headache, and mild lightheadedness. Physical and systems examinations were essentially normal, and Dr. Charles Staples diagnosed chest pain and an anxiety reaction and discharged the Plaintiff in good condition. (Tr. at 244-46.)

On February 28, 2008, Dr. Matthew Wallen examined the Plaintiff to assess her complaints of vomiting and diarrhea. Physical and systems examinations were normal, and her illness was described as "moderate." Dr. Wallen discharged the Plaintiff in stable condition and instructed her to take Tylenol or Motrin as needed. (Tr. at 249-51.)

On April 7, 2008, the Plaintiff returned to Trident Medical Center by ambulance, complaining of nausea, vomiting, abdominal pain, and dizziness. (Tr. at 254 and 258.) A physical examination revealed mild abdominal tenderness in the lower right quadrant, and Dr. Wallen found that the Plaintiff suffered from vomiting, dehydration, and acute positional vertigo. (Tr. at 259.) Dr. Wallen instructed the Plaintiff to rehydrate and prescribed Meclizine to counteract dizziness and nausea. The Plaintiff was discharged in stable and improved condition. (Tr. at 257.)

On June 6, 2008, the Plaintiff presented at Trident Medical Center with chest pain apparently brought on by a domestic dispute. The attending physician observed that the



Plaintiff was anxious and tearful, but that her heart rate, pulse, and rhythm were normal. Dr. Charlotte Newman opined that the Plaintiff had experienced an anxiety reaction, and she diagnosed the Plaintiff with costochondritis. Dr. Newman prescribed Naproxen for pain and instructed the Plaintiff to continue taking Xanax and Elavil. (Tr. at 261-62.)

On June 26, 2008, the Plaintiff returned for treatment, complaining of vomiting, diarrhea, and generalized abdominal pain. Dr. Mike Taylor evaluated the Plaintiff, but physical and systems examinations were essentially normal. Dr. Taylor prescribed Phenergan to treat nausea and advised the Plaintiff to follow up with a primary care physician. (Tr. at 265-68.)

The Plaintiff sought treatment on September 12, 2008, when she arrived at Trident Medical Center by ambulance complaining of stress brought on by a marital dispute. The Plaintiff reported mild depression, an inability to sleep, chest pain, and a dull, persistent headache; however, the chest pain subsided when she removed herself from the negative environment. (Tr. at 271.) Dr. Charles Staples administered an IV of Ativan and instructed the Plaintiff to continue taking Elavil and Xanax; to follow up with her primary care physician; and to set up an appointment with a psychiatrist. (Tr. at 273-74.) The Plaintiff received family counseling, and Dr. Staples discharged her in good condition. (Tr. at 272.)

The Plaintiff returned by ambulance the following day for evaluation, complaining of acute chest pain. The change of environment again alleviated her symptoms, and Dr. Staples diagnosed atypical chest pain, anxiety reaction, mild depression, and leukocytosis. He prescribed Xanax, advised that she continue taking her medication, and instructed her to follow up with a primary care physician. (Tr. at 276-82.)

On October 21, 2008, the Plaintiff arrived by ambulance at Trident Medical Center



complaining of depression and suicidal thoughts. Once more, she reported problems with anxiety and difficulty sleeping. The Plaintiff stated that she had left her job two months before based on a general feeling of apathy; that she wanted to end her emotionally abusive relationship with her husband; and that she had entertained thoughts of suicide. (Tr. at 283 and 287.) Dr. Michael Masiowski recommended that the Plaintiff be transferred to the MUSC Institute of Psychiatry ("IOP"), where she arrived in stable condition. (Tr. at 285.) When Dr. Christopher Pelic examined the Plaintiff and reviewed her medical history, he observed that her most significant stressor was marital discord and the reported emotional abuse from her husband. (Tr. at 216.) His report addressed the presence of both suicidal ideation and homicidal ideation (directed towards her husband) and noted her past overdose with an antidepressant. Dr. Pelic found that the Plaintiff was "oriented X3," that her mood was "down," and that her thought process reflected "passive" suicidal ideation. The Plaintiff's past history with Elavil prompted the treating team to prescribe Remeron and Trazodone in its place to assist with depression and difficulty sleeping. The Plaintiff benefitted from medication and group sessions, and by October 27, 2008, she showed "marked" improvement and her mood was "fine." Dr. Pelic discharged the Plaintiff and diagnosed her with major depressive disorder, recurrent; PTSD; and anxiety, not otherwise specified. (Tr. at 216-17.) He also assigned the Plaintiff a global assessment of functioning ("GAF") score of 70.[1]

---

[1] Clinicians use a GAF score to rate the psychological, social, and occupational functioning of a patient. GAF scores range from 0-100, and the higher the score, the greater the individual's ability to function and carry out activities of daily living. A GAF score of 51-61 indicates moderate symptoms or moderate difficulty in social or occupational functioning, while a GAF score of 61-70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some



On November 8, 2008, the Plaintiff arrived by ambulance at the Moncks Corner Medical Center, complaining of anxiety, depression, and homicidal thoughts, as well as bilateral and central chest pain (reminiscent of previous panic attack symptoms). Dr. Staples noted that the Plaintiff had taken four Remeron to go to sleep. (Tr. at 231.) During her examination, the Plaintiff revealed that she had wanted to harm her husband the night before and that she had stabbed a stuffed animal to vent her anger. Dr. Staples placed the Plaintiff in a safe room under supervision to guard against a possible suicide attempt. (Tr. at 235.) He recommended that the Plaintiff be readmitted to the IOP, but no beds were available. In addition, the Plaintiff had no health insurance and was ineligible to receive crisis funding. (Tr. at 289.) A hospital administrator placed the Plaintiff on the waiting list for the G. Werber Bryan Psychiatric Hospital, where she was admitted on November 14, 2008, and underwent a five-day, inpatient psychiatric evaluation. (Tr. at 309.) Dr. Alexander McDonald examined the Plaintiff, who "adamantly" denied any suicidal ideation over the course of her hospitalization. The Plaintiff admitted having symptoms of depression in the past and seemed willing to pursue outpatient care. Dr. McDonald assigned the Plaintiff a GAF of 65 and noted that she was "forward thinking with concrete plans for her future." His list of final diagnoses consisted of: adjustment disorder with depressed mood; bacterial vaginitis; and marital discord. (Tr. at 309.)

Dr. McDonald recommended that the Plaintiff follow up in two days at the Berkeley

---

difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." Parker v. Astrue, 664 F. Supp. 2d 544, 549 n.2 (D.S.C. 2009) (quoting Diagnostic & Statistical Manual of Mental Disorders–Text Revision (DSM-IV-TR) (2000)).

6



County Mental Health Center ("BCMHC"). On November 25, 2008, Dr. Patricia Young reported that the Plaintiff appeared neat and clean; was cooperative but guarded; exhibited a blunted and flat affect and an anxious and depressed mood; had slow, soft, and pressured speech; had an indecisive and disorganized thought process; obsessed about past abuse from her husband; complained of paranoid thoughts with ideas of hopelessness and worthlessness; denied suicidal or homicidal thoughts; and stated that she engaged in poor decision making adversely affecting herself and others. (Tr. at 369-70.) Dr. Young diagnosed the Plaintiff with major depressive episode, PTSD, and anxiety disorder not otherwise specified, and assigned the Plaintiff a GAF of 65. Dr. Young noted that the Plaintiff's prognosis was favorable if she complied with treatment. (Tr. at 370.)

On December 4, 2008, the Plaintiff told Dr. Ray Hodges that she continued to experience symptoms of sadness and depression, and she rated her mood a three to four on a scale of ten, with one indicating the greatest level of sadness. She continued to deny, however, the presence of suicidal or homicidal ideation. Dr. Hodges assigned the Plaintiff a GAF of 65. (Tr. at 362.)

BCMHC followed the Plaintiff's progress over the next year, although the record reflects that she regularly missed appointments and did not always take her medication as instructed. (Tr. at 357, 403-04, 406-07, 439-40, and 442.) The Plaintiff did not seek any treatment between September 2009 and February 2010.

On February 2, 2010, the Plaintiff presented at BCMHC with crying spells and anxiety. She admitted taking her Zoloft inconsistently but reported that she was looking for work. (Tr. at 403.) On March 2, 2010, the Plaintiff was evaluated for continued panic attacks, associated with nervousness and chest pain; however, the Plaintiff remarked that

7



she enjoyed being with family, going to church, and attending Bible study. (Tr. at 402.)

On April 2, 2010, the Plaintiff returned to BCMHC after experiencing a "bad" panic attack triggered by an altercation with her husband that had landed them both in jail. The report indicated that the Plaintiff continued to attend church and Bible study. (Tr. at 445.)

The Plaintiff was seen again on July 23, 2010, complaining of at least one recent panic attack. Her doctor prescribed Lexapro in place of her previous medications. The Plaintiff also complained that her treatment plan had little positive effect and that she was "not getting any better." Her doctor stressed the importance of taking her medication regularly and not missing appointments. (Tr. at 442.)

Notes from September and October of 2010 reveal that the Plaintiff's condition remained mostly unchanged. The Plaintiff continued to report sleep disturbances and a lack of energy. The Plaintiff stated that she was compliant with her medication; however, she had not attended group therapy due to situational anxiety. The Plaintiff also reported that she was working two days a week sitting with an elderly woman. (Tr. at 438-39.)

On July 23, 2009, Dr. Cashton Spivey performed a psychological evaluation of the Plaintiff, reviewing her medical history and conducting an assessment of her cognitive functioning. (Tr. at 345-47.) On testing, the Plaintiff managed a score of twenty-three out of a possible thirty points—a score reflecting probable cognitive difficulties. Dr. Spivey reported that the Plaintiff was unable to perform serial 7's; that she could not spell the word "world" backwards; and that she followed two of three steps during a three-step command. Dr. Spivey found that the Plaintiff drew upon a satisfactory general fund of information, while exhibiting poor abstract reasoning abilities, and that her insight and judgment "appeared to be fair." He diagnosed the Plaintiff with depressive disorder not otherwise



8

specified, PTSD by history, headaches, and vertigo, and he assigned her a current GAF of 50 and a GAF of 55 within the preceding year. (Tr. at 345-47.)

On August 19, 2009, state agency physician Dr. Olin Hamrick reviewed the Plaintiff's medical history. (Tr. at 372-85.) He wrote that while her claim of depression was credible, her allegations of panic attacks and PTSD were only partially credible and that such claims were not substantiated by objective medical evidence in the record. Dr. Hamrick concluded that her conditions did not meet the criteria of a Listing, and that her symptoms resulted in only mild limitations in her activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace. He also noted the Plaintiff's two episodes of decompensation. Dr. Hamrick determined that the Plaintiff retained the mental capacity to perform at least simple, unskilled work with no more than moderate limitations in function. State agency physician Dr. Michael Neboschick also reviewed the Plaintiff's medical history and reached the same conclusions. (Tr. at 410-23.)

Regarding the Plaintiff's physical condition, the Commissioner had the Plaintiff examined by Dr. William Maguire on August 6, 2009. (Tr. at 349-51.) Although her physical examination was unremarkable, the Plaintiff reported chest pain, vertigo, lower back pain, and intermittent headaches. Dr. Maguire assessed her chest pain as a likely product of anxiety and therefore not a cause of disability in itself. Dr. Maguire also determined that the Plaintiff's back pain and headaches were not severe. He did note, however, that the source of the Plaintiff's vertigo was unclear and suggested that she may suffer from Ménière's disease. Nevertheless, Dr. Maguire stated that this condition would not result in disability between episodes. (Tr. at 351.)

State agency physician Dr. Mary Lang reviewed the Plaintiff's medical records on



9

September 11, 2009, and conducted a Physical Residual Functional Capacity Assessment. Dr. Lang concluded that the Plaintiff's only limitations were that she should not regularly climb ladders, ropes, or scaffolds; she should avoid even moderate exposure to hazards such as machinery and heights; and she should not engage in work requiring her to discriminate fine objects at a distance until fitted with prescription lenses. Dr. Lang disagreed with Dr. Maguire's assessment of the Plaintiff's vertigo because no proper diagnosis of Ménière's disease had ever been made. Dr. Lang also questioned the credibility of the Plaintiff's claims of daily episodes of vertigo. (Tr. at 390-97.) On April 21, 2010, state agency physician Dr. Angela Saito reviewed the Plaintiff's medical files and reached the same conclusions as Dr. Lang. (Tr. at 424-31.)

### B.    The Plaintiff's Testimony

At the hearing in January of 2011, the Plaintiff testified that she lives with her mother and that she had not worked in years. Aside from occasionally assisting her mother with errands, the Plaintiff stated that she is fatigued most of the time and rests. She testified that she attends church and Bible study but that her ability to function is limited by weekly panic attacks, which require emergency care and cause anxiety, rapid heart rate, shaking, and sweating. The Plaintiff testified that she also suffers from vertigo, dizziness, and PTSD. She reported experiencing periods of depression associated with PTSD and confessed to suicidal ideation. The Plaintiff claimed to be compliant with her medication but stated that her treatment at BCMHC had not been helping. The Plaintiff testified that her panic attacks had not required hospitalization since 2008. (Tr. at 29-40.)

### C.    The Vocational Expert's Testimony



10

The ALJ asked the VE to assume a hypothetical in which an individual, thirty-one to thirty-five-years-old, with no past relevant work and with no exertional limitations aside from avoiding work hazards, was limited to repetitive, routine tasks not requiring continuous interaction with the public.  The VE testified that such an individual would be able to perform the duties of a representative occupation such as assembler.  The VE also stated that these jobs would decrease by half due to further limitations regarding the need to avoid rigid quotas or "production kinds of work."  Additionally, the VE testified that the hypothetical individual could perform the requirements of quality control examiner and sorter.  The VE opined that an individual needing to miss more than two days of work a month would be eliminated from working substantial gainful activity.  (Tr. at 49-52.)

## STANDARDS OF REVIEW

### I.    The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court.  The recommendation has no presumptive weight, and the responsibility for making the final determination remains with the Court. <u>Mathews v. Weber</u>, 423 US. 261, 269 (1976).  The Court reviews de novo those portions of the R&R to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

### II.    Judicial Review of a Final Decision

The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one.  Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial



11

evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Consequently, judicial review .

. . of a final decision regarding disability benefits is limited to determining whether the

findings are supported by substantial evidence and whether the correct law was applied."

Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966)). In assessing whether substantial evidence exists, the

reviewing court should not "undertake to reweigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of" the agency. Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## DISCUSSION

### I.    The Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability. The

Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §

423(d)(1)(A). This determination involves a five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful
> employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to
> determine whether, based upon the medical evidence, the claimant has a
> severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is



sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. § Part 404, subpart P, App.1. If so, the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

Mastro, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993). The burden of production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. Walls, 296 F.3d at 290.

Here, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since the date of application, April 16, 2009. At the second step, the ALJ found that the Plaintiff had the following severe impairments: vertigo, panic attacks, depression, and PTSD. Third, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App.1. The ALJ then determined that the Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid work hazards and be limited to simple, routine, repetitive tasks with no rigid quotas or production work with no interaction with the public. After determining that the Plaintiff had no past relevant work,



the ALJ found that jobs exist in the national economy that she could perform. Therefore, the ALJ concluded that the Plaintiff was not disabled.

## II.    The Parties' Briefs

In her brief, the Plaintiff asserts that: (1) the ALJ failed to properly employ the Commissioner's special technique for assessing mental impairments as outlined in 20 C.F.R. § 416.920a; (2) the ALJ failed to properly weigh the opinion evidence; and (3) the ALJ's findings at steps four and five of the sequential evaluation process are not supported by substantial evidence.

In response, the Defendant argues that: (1) the ALJ adhered to the special technique for evaluating mental impairments and reasonably concluded that the Plaintiff's condition did not meet or medically equal the criteria for a Listing; (2) the ALJ adequately considered and weighed all of the opinions in the record; and (3) the ALJ made a reasonable assessment of the Plaintiff's impairments and their functional impact in making an RFC determination.

## III.   The Magistrate Judge's R&R

In the R&R, the Magistrate Judge rejected the Plaintiff's arguments and recommended that the Court affirm the Commissioner's final decision.

First, the Magistrate Judge determined that the ALJ properly employed the Commissioner's special technique for assessing mental impairments, noting that the ALJ clearly addressed and made specific findings with regard to the broad categories of functioning–activities of daily living; social functioning; and concentration, persistence, or pace. In addition, the Magistrate Judge found that substantial evidence supports the ALJ's



14

finding that the Plaintiff does not meet the criteria for Listings 12.04 and 12.06, which deal with affective disorders and anxiety-related disorders, respectively.

Next, the Magistrate Judge found that the ALJ appropriately weighed the opinion evidence in accordance with 20 C.F.R. § 416.927. The Magistrate Judge noted that the ALJ did, in fact, discuss the findings from MUSC, Trident Medical Center, and BCMHC, and that these records indicate that the Plaintiff's symptoms were generally mild to moderate and that she received conservative treatment. Therefore, the Magistrate Judge rejected the Plaintiff's argument that the ALJ failed to acknowledge the opinions of the Plaintiff's treating psychiatrist at BCMHC, the Crisis Intervention Team, and the MUSC psychiatric team.

Finally, the Magistrate Judge determined that the ALJ did not conduct a flawed RFC analysis. Responding to the Plaintiff's complaint that the hypothetical presented to the VE was for an individual with no exertional limitations and was therefore irrelevant, the Magistrate Judge noted that both Dr. Lang and Dr. Saito did not find that the Plaintiff suffered any exertional limitations. Also, with respect to the Plaintiff's complaint that the ALJ failed to consider the exertional effects of her nonexertional impairments, the Magistrate Judge noted that the ALJ *did* find that the Plaintiff's ability to perform work at all levels was compromised by nonexertional limitations, and he took those into account. (See Entry 19 at18.) The Magistrate Judge emphasized that, in spite of having a limited medical history for the treatment of vertigo, the ALJ assigned some weight to the Plaintiff's testimony and to Dr. Maguire's assessment, and these considerations persuaded the ALJ to eliminate even moderate workplace hazards from the RFC determination. Finally, the Magistrate Judge concluded that the hypothetical posed to the VE was proper.



IV.     **The Plaintiff's Objections and the Court's Analysis**

The Plaintiff filed timely objections to the R&R.  In her objections, the Plaintiff first argues that the Magistrate Judge erred in upholding the ALJ's assessment of the Plaintiff's functional limitations.  The Plaintiff claims that the ALJ disregarded the weight of the evidence and relied on an insufficient number of exhibits, stating:

> The ALJ relied on **part of one exhibit** stating that Ms. Taylor could dress herself in determining that she suffered only mild limitations in ADLs.  It is important to note here that the ALJ did not even address the other areas that this very same exhibit addressed relevant to the ADL assessment.
>
> For instance, Dr. Spivey also reported that Ms. Taylor lived with her mother (goes to independence), who handled all her finances (goes to independence/effectiveness), and she performed no household chores (goes to independence/effectiveness).

(Entry 21 at 2-3 (emphasis in original).)  The Plaintiff also complains that the ALJ relied on only one exhibit in assessing her functioning, concentration, and persistence and pace. The Plaintiff argues: "[T]he record indicates that Ms. Taylor had marked to extreme limitations in social functioning, as evidenced by the abusive nature of her past relationships, from which the record indicates she has not yet made sufficient recovery." (Entry 21 at 3.)  The Plaintiff asserts: "The ALJ did not consider the fact that Ms. Taylor remained isolated and spent almost half of her time with her mother.  That Ms. Taylor occasionally participated in bible studies at church, in and of itself, does not serve to explain the ALJ's moderate limitation in this area." (Entry 21 at 3.)  In addition, the Plaintiff claims that the ALJ erred in addressing the Plaintiff's episodes of decompensation.

After review, the Court finds this objection to be without merit.  In evaluating mental impairments, the ALJ employs a special technique that considers four functional areas essential to the ability to work: activities of daily living; ability to maintain social functioning;



concentration, persistence, and pace in performing activities; and episodes of decompensation. 20 C.F.R. § 416.920a. The first three areas are rated using a five-point scale: none, mild, moderate, marked, and extreme.  The fourth area–episodes of decompensation–is rated using a four-point scale: none, one or two, three, four or more. Id. In applying the special technique here, the ALJ determined that the Plaintiff had mild limitations in activities of daily living and moderate limitations in her ability to maintain social functioning and her concentration, persistence, and pace. He also determined that the Plaintiff had experienced no episodes of decompensation of extended duration.

As an initial matter, the Court notes that its job is not to re-weigh the evidence presented to the ALJ and that such an undertaking would exceed the limits of judicial review. See Social Security Act § 205(g), 42 U.S.C. § 405(g) (2006); Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).  That is because "it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Here, the ALJ found that the Plaintiff was able to take care of her personal needs independently and prepare simple meals. Also, contrary to the Plaintiff's assertion, the ALJ did note that "[t]here is no evidence that the claimant has a social life outside of running errands and spending time with her mother," and that "the claimant tends to spend most of her time at home." (Tr. at 18.) The ALJ also noted, however, that the Plaintiff attended church and Bible study.  In finding that the Plaintiff had moderate difficulties in her concentration, persistence, or pace, the ALJ noted the Plaintiff's test scores on the Mini-Mental State Examination, which suggest probable cognitive difficulties and impairment in

17



short-term memory. Ultimately, the Court agrees with the Magistrate Judge that the ALJ made clear findings in each of the required functional areas, and although the Plaintiff does not agree with those findings, a review of the record convinces this Court that substantial evidence supports those findings. Moreover, the Court does not agree with the Plaintiff that the ALJ's decision is contrary to or inconsistent with the recent Fourth Circuit opinion of Jackson v. Astrue. 467 F. App'x 214 (4th Cir. Fed. 23, 2012) (unpublished).[2] Accordingly, this objection is overruled.

Next, because the ALJ found mild limitations in activities of daily living and moderate limitations in the other two areas–ability to maintain social functioning and concentration, persistence, and pace–the ALJ considered whether the Plaintiff's severe impairments (vertigo, panic attacks, depression, and PTSD) met or medically equaled the criteria of Lisitings 12.04 (affective disorders) or 12.06 (anxiety-related disorders). Both of these listings require the Plaintiff to prove, among other things, that her mental impairments resulted in at least two of the following: marked restrictions in the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. As previously stated, the Court believes that substantial evidence

---

[2] In Jackson, Judge Gregory noted that "[d]eficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." F. App'x 214, 217 (4th Cir. Fed. 23, 2012) (unpublished) (citing Atkins v. Virginia, 536 U.S. 304, 309 n. 3 (2002)). However, the issue in Jackson was whether the claimant met the listed impairment for mental retardation, Listing 12.05, which "is different from that of the other mental disorders listings." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05. In any event, the Court does not dispute that it is appropriate for an ALJ to examine the limitations set forth in Jackson when determining deficits in adaptive functioning, and the Court believes that the ALJ did just that here.



supports the ALJ's findings with respect to the first three categories, and that those findings are free from legal error. With respect to episodes of decompensation, the Plaintiff argued in her brief that "the record **consistently** shows that Ms. Taylor has essentially been in a state of decompensation since February of 2007, including three psychiatric hospitalizations at the end of 2008." However, contrary to the Plaintiff's initial assertion, the Court agrees with the Magistrate Judge's conclusion that substantial evidence supports the ALJ's finding that the Plaintiff had not experienced repeated episodes of decompensation (defined as three episodes within one year, or an average of once every four months), each of an extended duration (i.e., each lasting more than two weeks), as required to meet the standards of Listings 12.04 or 12.06. (Entry 14 at 16.)[3] This objection is therefore overruled.

The Plaintiff next asserts that the Magistrate Judge erred by referring to the Plaintiff's GAF scores when reviewing the ALJ's analysis of the Plaintiff's functioning, stating: "The ALJ did not state this as evidence in support of a particular finding. Therefore, this Court must not consider it." (Entry 21 at 4.) Specifically, in the R&R, the Magistrate Judge stated: "Plaintiff's GAF scores also indicated only mild symptoms that were not of a disability severity, and the ALJ's functional findings were essentially identical to those of the state agency psychological consultants, which he afforded significant

---

[3]  In her objections, the Plaintiff argues that the ALJ should have considered her "need for more structured psychological support systems," and that the ALJ's failure to do so constitutes harmful error. (Entry 21 at 3.) As noted in the Defendant's response, however, the Plaintiff did not raise this argument in her brief, and the Magistrate Judge cannot be faulted for failing to address an argument the Plaintiff did not make. In any event, the Court finds that substantial evidence supports the ALJ's determination that the Plaintiff had not experienced repeated episodes of decompensation, each lasting more than two weeks, as required to meet the standards of Listings 12.04 or 12.06.



weight." (Entry 19 at 13.)  Here, the Court notes that the ALJ most likely (and properly) did not rely heavily on the Plaintiff's GAF scores because the Administration has advised that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746-01, 50,764-765 (Aug. 21, 2000). Nevertheless, "a GAF rating is simply another observation which presumably is subsumed into the medical source's final assessment," Simpkins v. Astrue, 2010 WL 3257789, *7 (D.S.C. May 13, 2010), and the Court finds the Magistrate Judge's reference to the Plaintiff's GAF scores to be harmless under the circumstances, as the ALJ's evaluation of the Plaintiff's functioning is clear.

The Plaintiff also objects to the Magistrate Judge's treatment of her arguments regarding the ALJ's alleged errors at step three of the analysis.  The Plaintiff claims the ALJ failed to consider all of the relevant opinion evidence and failed to conduct a symptoms-to-criteria comparison analysis.  With respect to the first argument, the Magistrate Judge determined that the ALJ had, in fact, considered the opinion evidence. Next, however, the Magistrate Judge did not consider the second argument–whether the ALJ failed to conduct a symptoms-to-criteria comparison analysis in accordance with Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989)–but this is because the Plaintiff never raised this argument before the Magistrate Judge.  The Magistrate Judge can hardly be faulted for failing to address an argument that was not raised.  In any event, as previously indicated, the Court finds that substantial evidence supports the ALJ's special technique findings, and therefore, the Court finds no reversible error at step three of the ALJ's analysis.

Next, the Plaintiff objects to the Magistrate Judge's finding that substantial evidence



supports the ALJ's RFC determination.  The Plaintiff argues that the ALJ "erroneously found that Ms. Taylor had no exertional limitations," and that the ALJ "failed to consider the exertional limitations caused by Ms. Taylor's non-exertional impairments, including vertigo, thrombocytosis, and PTSD, depression, and panic disorder."  (Entry 21 at 7.)

As the Magistrate Judge noted, Drs. Lang and Saito reviewed the Plaintiff's medical records and did not assess any limits on her exertional capacity.  Dr. Maguire also found that the Plaintiff had no functional problems.  Moreover, the ALJ found that "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not fully credible." (Tr. at 20.) Finally, Drs. Hamrick and Neboschick reviewed the Plaintiff's records and determined that although she had some nonexertional impairments, she did not have any exertional impairments.   Ultimately, the ALJ took the Plaintiff's nonexpertional impairments into consideration when he determined that the Plaintiff's ability to perform the full range of work at all exertional levels was limited by the following nonexertional limitations: "the claimant must avoid work hazards and is limited to simple, routine, repetitive tasks with no rigid quotas or production work with no interaction with the public." (Tr. at 19.)   After reading the ALJ's decision "as a whole," the Court agrees with the Magistrate Judge that substantial evidence supports the ALJ's RFC determination.  Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011); see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964) (stating that the courts must scrutinize the record as a whole to determine whether the conclusions reached are rational).  Accordingly, this objection is overruled.



21

## **CONCLUSION**

Based on the foregoing, it is hereby:

**ORDERED** that the Magistrate Judge's R&R (Entry 19) is adopted and specifically incorporated herein; the Plaintiff's objections (Entry 21) are overruled; and the Commissioner's final decision denying benefits is affirmed.

**IT IS SO ORDERED.**

Sol Blatt, Jr.
Senior United States District Judge

September **13**, 2013
Charleston, South Carolina



22